IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

MELISSA DALEY,

        Plaintiff,

                                          CIV 06-0265 RLP/KBM

vs.

THE EVANGELICAL LUTHERAN
GOOD SAMARITAN SOCIETY,

        Defendant.

**MEMORANDUM OPINION AND ORDER
GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

        This matter comes before the court on the Motion of Defendant Evangelical Lutheran Good Samaritan Society ["Society" herein] for Summary Judgement [Docket No. 34].

        Society owns and operates the Four Corners Good Samaritan Village, where Plaintiff, Melissa Daley ["Daley" herein], was employed. [Complaint, ¶¶3, 7]. Daley has brought suit against Society alleging sexual harassment hostile work environment in violation of Title VII, 42 U.S.C.A. § 2000e-2(a)(1) and the New Mexico Human Rights Act, N.M.S.A. 1978 §28-1-1 et seq., intentional infliction of emotional distress and premises liability.

### I. STANDARD OF REVIEW

        Summary judgment is proper when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A dispute is "genuine" if the issue could be resolved in favor of either party. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Farthing v. City of Shawnee*, 39 F.3d 1131, 1135 (10th Cir.1994). A fact is "material" if it might reasonably affect the

outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Farthing*, 39 F.3d at 1134.

    A party who does not have the burden of proof at trial must show the absence of a genuine fact issue. *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir.1994), *cert. denied*, 115 S.Ct. 1315 (1995). Once the motion has been properly supported, the burden shifts to the nonmovant to show, through depositions, affidavits, and other competent evidence, that summary judgment is not proper. *Concrete Works,* 36 F.3d at 1518. All the evidence must be viewed in the light most favorable to the party opposing the motion. *Simms v. Oklahoma ex rel Department of Mental Health and Substance Abuse Services*, 165 F.3d 1321, 1326 (10th Cir.), *cert. denied*, 120 S.Ct. 53 (1999). Conclusory statements and testimony based merely on conjecture or subjective belief are not competent summary judgment evidence, *Rice v. United States*, 166 F.3d 1088, 1092 (10th Cir.), *cert. denied*, 120 S.Ct. 334 (1999), nor is hearsay *Starr v. Pearle Vision, Inc.*, 54 F.3d 1548, 1555 (10th Cir.1995).

## II.  UNDISPUTED FACTS

    The parties have submitted numerous facts, some undisputed, some disputed, some based on hearsay, some augmented with long, not necessarily contradictory explanations and some with no evidentiary support (see Plaintiff's Undisputed Material Fact II). For the purposes of this Motion, the court considers the following to be undisputed, with inferences drawn in favor of Daley, the non-moving party:

    1.    In 1989, Daley was the victim of an attack and kidnaping that caused physical and mental injuries. [UMF No. 10].

    2.     Daley was employed at Society's Four Corners facility as certified nursing assistant

and licensed practical nurse, from January 1, 2001 to October 2004.  [UMF No. 2].

      3.      On September 24, 2004, Daley called the son of a resident of the facility, to advise him that his mother had died.  [UMF No. 4].

      4.      Daley gave her condolences to the son, Mr. Slavin ["Slavin" herein], hugging him when he arrived.  During this hug, "he took his hand and ran it down (her) back – and grabbed (her) breast and held on to her shoulder with the other hand when (she) tried to pull away." [UMF No. 5].

      5.      Slavin is shorter and weighs less than Daley.  [UMF No. 38].

      6.      Shortly thereafter Daley again encountered Slavin as she was exiting a resident's room to obtain supplies from a treatment cart.  Although Daley felt that Slavin was blocking the door as she attempted to exit, putting his arms out to stop her.  [Plaintiff's response to UMF No. 8] this encounter did not involve physical contact.  [UMFs No. 8 & 9].

      7.      Daley encountered Slavin a third time when she was heading to a patio in another area of the facility.  She had to walk around him to proceed to the patio.  Although Daley states Slavin stood in a doorway and attempted to stop her and gather her up [Plaintiff's Response to UMF No. 10], this encounter did not involve physical contact  [UMF No. 10].

      8.      Daley met Irene Pike, a CNA, on the patio, and told her what happened.  Slavin stared at her though a window while she was engaged in this conversation.  [UMF No. 11].  Daley states that his conduct made her upset and disgusted, and that she felt that he was stalking her. [Plaintiff's response to UMF No. 11].

      9.      While on the patio, Pike told Daley of a prior incident between Slavin and his mother's

3

roommate involving inappropriate contact [UMF No. 12].[1] The parties have not addressed the date of this event. In a letter written by Society to the State of New Mexico Human Rights Division, Society indicates that it may have occurred in May 2004. [Docket No. 50, Ex.23., footnote 4].

10. Daley left the patio to find Gloria Skaggs [Skaggs herein], the director of nursing, to report the incident with Slavin. She found Skaggs at a nurse's station and they went immediately to Skaggs' office. [UMF No. 13].

11. After hearing of the incident, Skaggs stated that they should take a minute to calm down and pray [UMF No. 14], specifically that they should pray for Slavin to act better, keep the staff safe and for Daley not to be angry. [Plaintiff's response to UMF No. 14]. During this conversation, Daley shook, cried and was hysterical, and indicated that she could not handle what had just happened to her. Id.

12. Skaggs told Daley she could remain in Skaggs' office as long as she needed to and that she, Skaggs, would deal with Slavin so Daley did not have to any more. [UMF. No. 14].

13. Daley left Skaggs' office when she was paged to help with a resident. She worked until the end of her shift without any further contact with Slavin. [UMF No. 15].

14. Daley suffered a panic attack when she returned home. She called Skaggs at home to state she would not work the following day, September 22, because of how she was handing the

---

[1] Daley responded to this undisputed fact by stating that " that Pike told her Slavin had been caught with his hands down a resident's pants, and that Kurt Mehl, the administrator knew about it." [Plaintiff's Response to UMF No. 12]. This statement is hearsay. Daley appended portions of Ms. Pike's deposition to her Response to the Motion for Summary Judgment. Pike testified that she found Slavin with his arm around a resident's arms and his hand in her blouse, that she filled out a concern form reporting this incident and that she slipped this form under Mr. Mehl's office door. (Doc. No. 50, Ex. 12). Accordingly, the court accepts as undisputed for the purposes of this Motion that there was a prior incident of sexually inappropriate conduct between Slavin and a resident.

4

incident with Slavin.  [UMF No. 16].

  15. Daley drove to the Four Corners Facility on September 22, 2004, to report the incident to the Administrator, Knut Mehl [Mehl herein].  Daley told him of the 1989 attack, of which he was unaware, and the incident of the prior day involving Slavin.  [UMF No. 17].

  16. Skaggs had not informed Mehl of the incident involving Slavin and Daley prior to Mehl's conversation with Daley.  [Plaintiff's Response to UMF No. 18].

  17. Although the parties differ as to the exact content of the discussion, they agree that Mehl and Daley discussed whether the incident had been witnessed by a third person, whether to report the incident to the police, that Daley was leery of doing so and that Mehl told Daley he would make sure Slavin left if he ever came back to the facility.  [UMF No. 18]. Staff members were not instructed to be on the alert to report if Slavin returned to the facility.  [Plaintiff's Response to UMF No. 18].

  18. Later that day, Daley left a message for Mehl, asking that her name and phone number be removed from the books at the nurse's station.  [UMF No. 19 and Plaintiff's Response to UMF No. 19].  Her name and phone number were removed on September 27, 2004, after Slavin had returned to the facility.  Id.  No explanation has been offered for this delay.  Id.

  19. Daley returned to work on September 27, 2004.  [UMF No. 20].  During her shift, Slavin walked into the building, causing her to become frightened.  She went to the locked Alzheimer's Unit of the facility.  Mehl told her he would try to find out why Slavin was there.  [UMF No. 21].

  20. Daley had a panic attack [UMF No. 22], and was found by Fourr in the family room of the Alzheimer's unit, crouched behind a chair, crying and sobbing, very upset.   [Plaintiff's

5

Response to UMF No. 22]. Fourr then told Daley about a prior incident where Slavin inappropriately touched Ashley Hoyt [Hoyt herein], a former CNA at the facility. [UMF No. 22].

21.     The Slavin-Hoyt incident occurred prior to March 2004 [UMF 23], perhaps as early as January 2004. [Plaintiff's Response to UMF 23]. Slavin grabbed Hoyt, hugged her, touched and/or squeezed both of her breasts and said, "thanks." [Plaintiff's Response to UMFs 22-23]. The Social Services Director, Jack Bixler [Bixler herein], was notified and he confronted Slavin. Bixler told Slavin that he could not engage in such inappropriate conduct in the future toward staff, residents or employees of the facility. [UMF 23]. Slavin indicated he understood and would refrain from such conduct in the future.[2] [UMF 23].

22.     Society did not document the Slavin-Hoyt incident. [Plaintiff's Response to UMF No. 23], despite having written policies and procedures in place regarding the investigation of and preparation of reports detailing incidents or occurrences involving facility visitors. [Plaintiff's Response to UMF23 and Additional UMF A-G, I).

23.     Following the Hoyt-Slavin incident, Fourr advised other young female employees that worked with Hoyt to avoid Slavin. Hoyt asked Fourr if she could avoid working around Slavin by changing shifts. Fourr agreed, and Hoyt switched to the morning shift. Hoyt disliked the morning shift, so switched back to her regular shift. She never ran into Slaving again. [UMF 24].

24.     Hoyt was upset over the incident with Slavin, but did not have to seek counsel with anyone. Her employment later ended for unrelated reasons. [UMF 25].

25.     On September 27, 2004, Fourr, Daley spoke to Mehl (Plaintiff's Response to UMF

---

[2]Daley, in her Response to UMFs 22 & 23 states that Slavin tried to hug Hoyt on another occasion thereafter. The deposition testimony of Hoyt cited to support this statement indicates that he "asked" for another hug when he apologized to her for his prior conduct.

6

21 & 22], after which Fourr took Daley to the police department, to report the incident with Slavin. They spoke to a detective about obtaining a no trespass order. [UMF 26]. The Parties utilize hearsay to dispute what the detective said, and his testimony is not part of the record.[3]

26.   Fourr and Skaggs informed others to call the police if they saw Slavin at the facility.[4] [UMF 27, and deposition testimony referenced in Plaintiff's Response to UMF 27].

27.   Daley tried to work on September 28, but was unable to complete her shift. [UMF 28].

28.   Daley called the police department on September 29, September 30, October 1 and October 5 to check on the status of the no trespass order. [Plaintiff's Response to UMF 29,30]. The order was put in place on October 5. [UMF 30]. Once the order was in place, Skaggs did not call Daley to inform her that it had been put in place. [Plaintiff's Response to UMF 30].[5]

29.   Daley did not independently file any charges against Slavin. [UMF 31].

30.   Daley contacted Society's corporate office to complain. She was contacted on October 6, 2004, by Donna Thompson, a Human Resources Consultant, to see what Thompson

---

[3]Society, citing the testimony of Fourr maintains that the detective indicated Society simply needed to call if Slavin showed up again, and that he would contact Slavin about the no trespass order. Daley submitted her affidavit stating that the detective stated he would contact Skaggs about the no trespass order, and that Daley called Skaggs who said that Society would request the order.

[4]Fourr's testified that she relayed this information to Gloria (Skaggs), Bob (Fullmer), Knut (Mehl), the nurses at the nurses station and the employees at the visitors entrance side of the building Slavin would have to come into. (Deposition Fourr, p. 43, line 9 - p. 45, line 1). Skaggs testified that Fourr told her that they should call 911 if Slavin tried to come back, and she told the nursing staff that a restraining order had been obtained. (Deposition Skaggs p. 57 line 10 - p. 58-8).

[5]It appears from Daley's handwritten notes that she was informed by the detective on October 5 that he would follow through with the no trespass order. (Ex. 13 to Docket No. 50).

7

could do to help resolve the problem.[6] Daley told Thompson that she wanted to be able to resign with a letter of recommendation, to be paid for therapy now and into the future, severance pay, including all paid time off, vacation fund and Christmas Fund monies. [UMF No. 33 and Plaintiff's Response to UMF No. 33].

31.     On October 8, Thompson provided Daley with four options:  1) continue to work at the Four Corners facility; 2) take a general leave of absence, followed by a return to work at Four Corners facility ; 3) transfer to another Society facility; or 4) resign with a letter of recommendation and payment of severance package.  [UMF No. 34]

32.     Daley rejected these options because she did not feel that they were in her best interest [UMF No. 35] and she not think the options were adequate.  [Plaintiff's Response to UMF No. 35]

33.     Daley did not want to return to work because she was afraid to work for the people at Society because they did not stand by her and "had a grudge against [her] for turning them in, and felt that [her] employment there would not go well from that period forward." [UMF 35].  Daley did not return to work because she was afraid to, did not feel safe, was fearful Defendant would retaliate against her for filing a grievance against Skaggs, did not trust Defendant, [felt] Defendant failed: To fulfill its duties, comply with its policies or stand by her, provide a safe work environment and was unreceptive, unresponsive and unsympathetic to the emotional difficulties she was experiencing. [Plaintiff's Response to UMF No. 35].

### III. ANALYSIS

### Count I
### Sexual Harassment Under Title VII and the New Mexico Human Rights Act.

---

[6]It appears from Daley's handwritten notes that Thompson called Daley twice on October 5th, there were scheduling difficulties, and the call was finally completed the following day.  Id.

A. Hostile Work Environment

Actions for sexual harassment based on hostile work environment require that the harassing conduct be "sufficiently severe or pervasive 'to alter the conditions [of the victim's] employment and create an abusive working environment.'" *Meritor Sav. Bank, FB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, (*quoting Henson v. Dundee*, 682 F.2d 897, 904 (11th Cir. 1982). "The conduct must be both objectively and subjectively abusive, and need not lead to a nervous breakdown before Title VII comes into play." *Lockard*, 162 F.2d at 1071. There is no mathematically precise test for evaluating the abusiveness of such conduct. All circumstances must be evaluated. While factors such as frequency, severity, whether the conduct is physically threatening or humiliating as opposed to mere offensive utterance, and whether it unreasonably interferes with an employee's work performance are considered, no single factor is required. *Id.* Employers may be liable under a negligence theory for the sexual harassment of an employee by a business invitee " 'if they 'fail[] to remedy or prevent a hostile or offensive work environment of which management-level employees knew or in the exercise of reasonable care should have known.' " *Lockard v. Pizza Hunt Inc.*, 162 F.3d 1062, 1074 (10th Cir. 1998) (quoting *Hirshfield v. New Mexico Corrections Dep't*, 916 F.2d 572, 577 (10th Cir. 1990)). The employer is not strictly liable for all harassment of which it has actual or constructive knowledge; it may meet its duty to respond to workplace sexual harassment by taking appropriate remedial or preventative action reasonably calculated to end the harassment. *Cf. Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 675-676 (10th Cir. 1998) (applying standard to employer's response to harassment by co-employees).

Based upon these standards, there are two issues to consider in evaluating Daley's claim of sex discrimination based on hostile work environment: First, whether the conduct complained of was

subjectively and objectively abusive; second, whether Society fulfilled its duty to take appropriate remedial or preventative action to end harassment by Slavin. There remain questions of fact which preclude Summary Judgment on Plaintiff's claims under Title VII and the New Mexico Human Rights Act.

As to the first issue, it is conceded for the purposes of this Motion that Slavin's groping of Daley was subjectively humiliating. There is a genuine issue of material fact as to whether the groping of female employees in a nursing home setting by a resident's family member is objectively humiliating. Although Hoyt did not respond to the groping in the same way or to the same extent as Daley, she found it sufficiently upsetting to request a shift change so she would not be in contact with Slavin in the future.

As to the second issue, as of September 24, 2004, management level employees of Society were on prior notice of inappropriate conduct by Slavin toward at least one employee (Hoyt) and at least one resident.

In *Adler*, the Tenth Circuit noted that an end to harassment shows that remedial or preventive steps taken by an employer are effective. *Adler*, 144 F.3d at 676. The undisputed facts indicate that there were no incidents of sexual harassment of female employees by Slavin following the Hoyt incident, when Slavin was confronted by Bixler, until September 21, 2004. Were that the only prior incident, Society would have satisfied its burden of showing that the steps it took following the Hoyt/Slavin incident were reasonably calculated to end the harassment. However, evidence of inappropriate conduct by Slavin involving a facility resident following the Hoyt incident, which was not investigated, and following which no remedial or preventative actions were taken, raises a genuine issue of material fact as to whether Society acted reasonably.

B.  Constructive Discharge

In order to prove constructive discharge,

> An employee must allege facts sufficient to find that the employer made working conditions so intolerable, when viewed objectively, that a reasonable person would be compelled to resign. *See Derr v. Gulf Oil Corp.*, 796 F.2d 340, 344 (10th Cir.1986). "Essentially, a plaintiff must show that she had no other choice but to quit." *Yearous v. Niobrara County Mem'l Hosp.*, 128 F.3d 1351, 1356 (10th Cir.1997) (quoted authority omitted). "The bar is quite high" for proving constructive discharge. *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1221 (10th Cir.2002).

*Gormley v. Coca-Cola Enters.*, 2005 NMSC-003, ¶10, 137 N.M. 192, 194-195, 109 P.3d 280, 282-283 (2005).

Among the factors considered in evaluating whether a reasonable person would have had no other choice but to quit are

> (1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice [s]he was given; (3) whether the employee was given a reasonable time in which to choose; and (4) whether [s]he was permitted to select the effective date of resignation.

*Yearous v. Niobrara County Mem'l Hosp.*, 128 F.3d 1351, 1356 (10th Cir. 1997) (citations omitted). It is undisputed that Daley was given several alternatives to resignation, that she was provided time off following the incident with Slavin, that her decision to reject all alternatives was made after steps were taken to prevent future harassment (after no-trespass order was put in place and after her request that her personal information be removed from the nurses station), and that she evaluated the options she was given.

The question is not whether working conditions at the facility were difficult or unpleasant. Rather, in evaluating constructive discharge, the question is whether Daley had the opportunity to make a free choice regarding her employment relationship with Society prior to her resignation.

11

*Yearous*, 128 F.2d at 1357. On this record, I conclude as a matter of law that she did. Viewing the facts objectively and considering the totality of the circumstances as the law requires, I believe no reasonable jury could conclude that Daley was constructively discharged.

## Count II
## Intentional Infliction of Emotion Distress

New Mexico has adopted the Restatement (Second) of Torts § 46 (1965) in defining the approached used to evaluate a claim of intentional infliction of emotional distress [IIED]. IIED requires a showing that:

> (1) the conduct in question was extreme and outrageous; the conduct of the defendant was intentional or in reckless disregard of the plaintiff; (3) the plaintiff's mental distress was extreme and severe; and (4) there is a causal connection between the defendant's conduct and the claimant's mental distress. *Hakkila v. Hakkila*, 112 N.M. 172, 182, 812 P.2d 1320, 1330 (Ct.App.1991) (Opinion of Donnelly, J.). The Restatement describes extreme and outrageous conduct as that which is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Restatement (Second) of Torts § 46 cmt. d; *see also Stieber v. Journal Publ'g Co.*, 120 N.M. 270, 274, 901 P.2d 201, 205 (Ct.App.1995); UJI 13-1628 NMRA 2001 ("Extreme and outrageous conduct is that which goes beyond bounds of common decency and is atrocious and intolerable to the ordinary person.").

*Trujillo v. N. Rio Arriba Elec. Coop., Inc.*, 131 N.M. 607, 616-617, 41 P.3d 333, 342-343 (2001).

It is the responsibility of the trial court to determine as a matter of law whether the conduct at issue "reasonably may be regarded as so extreme and outrageous that it will permit recovery under the tort of intentional infliction of emotional distress." *Trujillo*, 131 N.M. 617, 41 P.3d 343, *quoting Padwa v. Hadley*, 1999-NMCA-067, ¶ 9, 127 N.M. 416, 981 P.2d 1234. The absence of any one element will defeat the claim. *Trujillo*, 131 NM at 617, 41 P.3d at 343. "When reasonable persons may differ on that question, a jury question is presented. *Id.* (relying upon Restatement (Second) of Torts § 46 cmt. h).

At the outset, it must be noted that the conduct which is the subject of Plaintiff's IIED claim is not that of Slavin. The issue here is whether the response of Society to Slavin's reported conduct and Society's subsequent dealings with Daley qualify as "extreme" or "outrageous" under the legal standards cited above.

Accepting all well-supported factual allegations as true and construing them in the light most favorable to Daley, I find that the conduct of Society does not rise to the egregious level necessary to permit recovery under the tort of intentional infliction of emotional distress.

Society confronted Slavin after the incident involving Hoyt. After Slavin groped Daley several months later, Daley's supervisor took steps to prevent her from coming into contact with Slavin again that day. Daley was given time off from work to deal with her trauma. She met with the facility administrator, Mehl, who assured her he would respond if Slavin ever returned to the facility. When Slavin did return Mehl attempted to locate him while Daley was provided a safe place to go. Daley and Slavin never actually came in contact on that occasion, and he never returned to the facility thereafter. Although there was a delay of several days in removing Daley's name and address from the books at the nurses station, there is no evidence that Slavin would have had access to these books. Fourr accompanied Daley to the police station to make complaint regarding Slavin. A no- trespassing order was discussed with the police officer. Fourr and Skaggs informed at least some staff to call the police if Slavin returned. Plaintiff was provided several options in lieu of returning to work at the Four Corner's facility. Society's actions are in stark contrast to those found representative of intentional infliction of emotional distress in *Coates* v. Wal-Mart Stores, Inc., 127

13

N.M. 47, 976 P.2d 999 (N.M. 1999).[7] Although the actions of Society and its employees were not perfect, and in some respects were sloppy, the undisputed facts establish that those actions do not evince intentional or reckless disregard of Daley, nor do they rise to the level of extreme and outrageous conduct.

## Count III
## Premises Liability

In Count III Daley seeks damages from Society for its failure to control the premises where Slavin was a visitor and she an employee. New Mexico follows the rule that a landowner or employer has a duty to use reasonable care in providing a safe place to work for his employees or other persons occupying the status of a business invitee. *Requarth v. Brophy*, 111 N.M. 51, 52, 801 P.2d 121,122 (1990).[8]

Society argues that Daley's premises liability claim is barred by the exclusive remedy provisions of the New Mexico Workers' Compensation Act. Daley responds that her claim for Worker's Compensation was denied because her injuries were not covered by the Act. No party has provided to the court an Order or other ruling by the Workers' Compensation Administration to support their position that her claim was or was not recognized as compensable under the workers' compensation laws of New Mexico. If such an Order exists, presumably both parties have a copy of

---

[7] Numerous incidents of severe sexual harassment of two female employees over the course of a year by a co-employee were reported to and personally observed by management. Requests for reprimand were ignored and no disciplinary action initiated. One claimant was advised that her harasser would become her supervisor, and if she objected her only alternative was to quit.

[8] Owners/occupants owe a duty of ordinary care to keep their premises safe for use by visitors U.J.I. 13-1309. A visitor is a person who enters or remains on the premises with the express or implied permission of the owner/occupant, U.J.I. 13-1302. The duty of ordinary care to keep premises safe is breached when the owner/occupant fails to protect visitors from foreseeable risks of injury from a third person. U.J.I. 13-1320.

it.

In *Coates*, the New Mexico Supreme Court held that claims for negligent supervision and intentional infliction of emotional distress arising from workplace sexual harassment were not barred by the exclusive remedy provision of the Workers' Compensation Act, stating:

> 'The exclusivity provided for by the New Mexico Workmen's Compensation Act is the product of a legislative balancing of the employer's assumption of liability without fault with the compensation benefits to the employee . . ." (citation omitted). However, the WCA will preclude other claims only if the injury falls within the scope of the WCA. (citation omitted). The WCA only covers work-related accidents and only injuries that fall within the act's coverage. A claim falls outside the WCA for work-related injuries if: 1) the injuries do not arise out of employment, (citation omitted); 2) substantial evidence exists that the employer intended to injure the employee, (citation omitted); or 3) the injuries were not compensable under the WCA (citation omitted).

*Coates*, 127 N.M. at 52, 976 P.2d at 1004.

The New Mexico Supreme Court went to on hold that injuries caused by sexual harassment did not arise out of employment, permitting Plaintiff to proceed with her claims for negligent supervision and intentional infliction of emotional distress.[9] There is no reason to treat a claim predicated on premises liability arising from workplace sexual harassment any differently. Such a claim is not barred by the exclusive remedy provision of the Workers' Compensation Act, provided the claim otherwise meets the criteria for recovery.

In her Complaint, Daley alleges that she has suffered emotional distress, mental anguish,

---

[9]The Court also held that the other two exceptions to the exclusivity rule applied: That the employee-plaintiffs had alleged and presented sufficient evidence at trial that the employer's supervisors had acted intentionally to injure the employee by failing to take any action over the course of a year to protect the employees-plaintiffs from repeated sexual harassment by a co-employee of which the supervisors were aware, and by failing to discipline the harasser; and that the type in psychological injury suffered by the claimant was not a primary mental impairment or secondary mental impairment as defined in the Workers' Compensation Act, and was therefor not compensable under the Act. Coates, 127 N.M. at 52-54; 976 P.2d at 1004-1006.

anxiety and humiliation. [Docket No. 1, p. 9-10]. In the Pretrial Order, filed May 21, 2007, Daley states that she alleges damages stemming from emotional distress, mental anguish, embarrassment and humiliation. She did not allege a physical injury. [Docket No. 66].

Society contends that because premises liability is grounded in negligence, damages for stand alone emotional distress without accompanying physical injury are not permitted under New Mexico law. Society relies on *Akutawaga v. Laflin, Pick & Heer, P.A.*, 138 NM 774, 126 P.3d 1138 (Ct. App. 2005), which states:

> Generally speaking, damages for emotional distress in ordinary negligence actions are not permitted in New Mexico. *Flores v. Baca*, 117 N.M. 306, 313, 871 P.2d 962, 969 (1994). New Mexico allows recovery for stand alone emotional distress only in limited circumstances, including intentional infliction of emotional distress, in connection with certain intentional economic torts, and in contractual situations where the specialized nature of the contract naturally contemplated that reasonable care would be taken to avoid the infliction of severe emotional distress. *See Jaynes v. Strong-Thorne Mortuary, Inc.*, 1998-NMSC-004, ¶ 18, 124 N.M. 613, 954 P.2d 45 (stating that "[i]ntentional infliction of emotional distress arises when a defendant intentionally or recklessly causes severe emotional distress through extreme and outrageous conduct"); *Flores*, 117 N.M. at 311, 871 P.2d at 967 (stating that courts permit recovery for mental anguish caused by breach of contract in cases in which the purpose of the contract would be frustrated unless such damages were awarded, for example in a contract for funeral services). New Mexico does not recognize negligent infliction of emotional distress as a cause of action except for bystander liability. *Jaynes*, 1998-NMSC-004, ¶ 21, 124 N.M. 613, 954 P.2d 45.

*Akutawaga, P.A.*, 126 P.3d at 1143.

Daley responds that her claim for emotional distress damages stems from intentional infliction of emotional distress. [Docket No. 50, p. 14]. In other words, she is not seeking damages for ordinary negligence under the umbrella of a premises liability claim, but for an intentional tort committed by Society.

As previously stated, Daley's claim for intentional infliction of emotional distress fails because

16

the undisputed facts establish that Society's actions do not evince intentional or reckless disregard of Daley, nor do they rise to the level of extreme and outrageous conduct.

### Punitive Damages

Punitive damages may not be awarded in a claim brought under the New Mexico Human Rights Act. *Trujillo v. Northern Rio Arriba Elec. Co-op.*, 131 N.M. 607, 618, 41 P.3d 333, 344 (N.M. 2001). The Civil Rights Act of 1991 allows a plaintiff to recover punitive damages only upon proof that a defendant acted with "with malice or reckless indifference" to the plaintiff's right to be free from hostile work environment sexual harassment. See 42 U.S.C. § 1981a(b)(1); *Fitzgerald v. Mountain States Tel. & Tel. Co.*, 68 F.3d 1257, 1262 (10th Cir.1995).

Daley's hostile work environment claim rests on the occurrences dating from September 21, to approximately October 5, 2004. Following the groping by Slavin, her supervisor took steps to prevent her from coming into contact with Slavin again that day. She was given time off from work to deal with her trauma. She met with the facility administrator, Mehl, who assured her he would respond if Slavin ever returned to the facility. When Slavin did return Mehl attempted to locate him while Daley was provided a safe place to go. Daley and Slavin never actually came in contact on that occasion, and he never returned to the facility thereafter. Although there was a delay of several days in removing Daley's name and address from the books at the nurses station, there is no evidence that Slavin would have had access to these books. Ms. Fourr accompanied Daley to the police station to make complaint regarding Slavin. A no- trespassing order was discussed with the police officer. Fourr and Skaggs informed at least some staff to call the police if Slavin returned. Plaintiff was provided several options in lieu of returning to work at the Four Corner's facility.

Society's actions do not approach the malice or reckless indifference necessary to permit an

17

award of punitive damages based on workplace sexual harassment. Cf. *Fitzgerald v.* 68 F.3d at 1264.

**IT IS HEREBY ORDERED AS FOLLOWS:**

1. Defendant's Motion for Summary Judgment on Count I of the Complaint seeking recovery based on hostile work environment sexual harassment Under Title VII and the New Mexico Human Rights Act, is denied, and this claim will proceed to trial.

2. Defendant's Motion for Summary Judgment on Count I of the Complaint seeking recovery based on constructive discharge Under Title VII and the New Mexico Human Rights Act is granted for the reasons stated herein.

3. Defendant's Motion for Summary Judgment on Count II of the Complaint seeking recovery based on intentional infliction of emotional distress granted for the reasons stated herein.

4. Defendant's Motion for Summary Judgment on Count III of the Complaint seeking recovery based in premises liability is granted for the reasons stated herein.

5. Defendant's Motion for Summary Judgment on Plaintiff's prayer for punitive damages is granted for the reasons stated herein.

**IT IS SO ORDERED.**

        RICHARD L. PUGLISI
UNITED STATES MAGISTRATE JUDGE
(sitting by designation)